**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-0079-WJM-MJW

MATTHEW CARTIER, on behalf of himself and all similarly situated persons,

    Plaintiff,

v.

WESTERN ELECTRICITY COORDINATING COUNCIL, a Utah corporation,

    Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

    Plaintiff Matthew Cartier ("Cartier") was formerly employed by the Western Electricity Coordinating Council ("WECC"). (ECF No. 16 ¶ 2.) Cartier brings this action on behalf of himself and behalf of others at WECC who held Cartier's same position, claiming that WECC failed to pay overtime wages required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and similar Colorado statutes. (*See generally id.*)

    Before the Court are Cartier's and WECC's competing motions for partial summary judgment. (ECF No. 44 (Cartier); ECF No. 48 (WECC).) For the reasons explained below, the Court grants Cartier's motion in part and holds that any overtime offset under 29 U.S.C. § 207(h)(2) must be calculated on a workweek-by-workweek basis. Cartier's motion is otherwise denied. The Court grants WECC's motion in part and holds that the Colorado Minimum Wage Order does not apply to WECC, and

therefore Cartier's state-law cause of action fails. WECC's motion is otherwise denied.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

Unless otherwise noted, the following facts are undisputed for purposes of the parties' motions.

WECC is a non-profit corporation responsible for supervising and maintaining critical portions of the electrical power grid from western Canada to northern Baja

California, Mexico.  (Movant's Statement of Material Facts ("Defendant's Facts") (ECF No. 48 at 3–6) ¶¶ 3–6.)  WECC employed Cartier as a Reliability Coordinator System Operator ("RCSO") from June 2008 through December 2013 in WECC's Loveland, Colorado, facility.  (*Id*. ¶ 1.)  The job of an RCSO is "analogous to [that of an] air traffic controller[,] only, instead of air traffic, they monitor[] the daily operations" of important parts of the electrical grid.  (*Id*. ¶ 7.)

For most of Cartier's employment at WECC, RCSOs would work twelve-hour shifts beginning at either 6:30 AM or 6:30 PM, and each RCSO would receive an additional fifteen minutes of pay at the end of a shift to participate in the shift change.  (*Id*. ¶ 10.)  In terms of overtime, WECC agreed to pay RCSOs time-and-a-half for hours worked over twelve hours in a shift, or hours worked over forty hours in a workweek.  (*Id*. ¶ 12.)  In calculating "hours worked" (including any associated overtime), WECC not only counted actual hours on the job, but also certain amounts of vacation and personal time off.  (*Id*. ¶¶ 13, 15, 16.)

WECC defined its workweek to begin every Sunday morning at 12:01 AM and end at midnight the following Saturday night.  (*Id*. ¶ 11.)  If an RCSO worked the night shift beginning on Saturday night and running into Sunday morning, his or her hours were credited toward the workweek in which the shift began.  (*Id*. ¶ 17.)

The parties' statements of material facts are curiously void of any allegation regarding actual instances of failure to pay FLSA-mandated overtime wages.  Cartier's *complaint* alleges that WECC would sometimes apply overtime hours from one week to a previous, non-overtime week, thus negating the time-and-a-half pay rate; and that

WECC sometimes would not pay overtime for the fifteen carryover minutes at the end of each shift. (ECF No. 16 ¶¶ 8–9.) But Cartier makes no such claims in his statement of material facts and otherwise points to no evidence supporting these allegations. WECC, for its part, claims *in argument* that Cartier "can point only to a handful of isolated instances in 2012 and 2013 in which he worked a night shift that overlapped two work weeks and WECC counted all [of Cartier's] hours during that shift toward the work week in which the shift started." (ECF No. 48 at 8; *see also* ECF No. 47 at 9.) But WECC makes this assertion in argument *only* (not as part of its statement of material facts) and otherwise points to no evidence supporting this claim.

Regardless, it appears that Cartier was highly compensated for his services. In 2012, his gross pay was over $132,000; and in 2013, over $144,000. (Defendant's Facts ¶¶ 18–19.) Cartier's employment ended on December 31, 2013, when WECC split into two entities. (*Id*. ¶ 20.) Cartier and all of the other RCSOs were then hired by the new entity. (*Id*. ¶ 21.)

### III. ANALYSIS

#### A.   FLSA

The parties principally dispute the proper application of an FLSA provision that permits employers to credit certain forms of "[e]xtra compensation . . . toward overtime compensation payable pursuant to [the FLSA]." 29 U.S.C. § 207(h)(2). Such "extra compensation" includes, for example, "a premium rate paid for certain hours worked . . . in excess of the employee's normal . . . or regular working hours." *Id*. § 207(e)(5). WECC argues that its pay policies, such as paying for the fifteen-minute shift transition

and counting certain vacation time as working hours, created "extra compensation" that it may use to offset unpaid FLSA-mandated overtime. (ECF No. 48 at 7–10.) Even more importantly, however, WECC argues that this offset accumulates over time and may be applied at any time, including to offset a judgment for unpaid overtime. (*Id*. at 10–13.) Cartier disagrees and asserts that WECC may only offset overtime against extra compensation earned in the same workweek. (ECF No. 44 at 2–3.)

The FLSA itself does not address this dispute. And, surprisingly, no Labor Department regulation settles the question either—although similar questions have been coming up for almost seventy years. *See Roland Elec. Co. v. Black*, 163 F.2d 417, 420–21 (4th Cir. 1947) (holding in similar circumstances, under an earlier statutory framework, that extra and bonus compensation cannot cumulatively offset unpaid overtime wages). Accordingly, a split of authority has developed.

1. <u>Decisions Favoring Employees</u>

The Sixth, Seventh, and Ninth Circuits, along with various district courts, have held that FLSA-mandated overtime may only be offset by extra compensation earned in the same workweek. *See Haro v. City of Los Angeles*, 745 F.3d 1249, 1259–60 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 138 (2014); *Herman v. Fabri-Centers of Am., Inc.*, 308 F.3d 580, 585–92 (6th Cir. 2002); *Howard v. City of Springfield*, 274 F.3d 1141, 1145–49 (7th Cir. 2001); *Rudy v. City of Lowell*, 777 F. Supp. 2d 255, 259 (D. Mass. 2011); *Conzo v. City of New York*, 667 F. Supp. 2d 279, 291 (S.D.N.Y. 2009); *Bell v. Iowa Turkey Growers Co-op.*, 407 F. Supp. 2d 1051, 1063 (S.D. Iowa 2006); *Nolan v. City of Chicago*, 125 F. Supp. 2d 324, 331 (N.D. Ill. 2000). These courts, to a greater or

lesser degree, found the following considerations persuasive.

First, the FLSA is intended to protect employees, and its overtime provisions in particular were intended to impose an immediate cost on employers, thus dissuading overtime work. *Herman*, 308 F.3d at 590; *Howard*, 274 F.3d at 1148; *Rudy*, 777 F. Supp. 2d at 261–62. Cumulative offsets might undermine these goals. The Seventh Circuit, for example, posited a situation where an employer could require employees to work long overtime hours one year but pay only the usual rate, and then pay premiums the second year to offset that liability. *Howard*, 274 F.3d at 1149.

Second, the FLSA pervasively prescribes or assumes a unitary seven-day workweek as its basic unit of measure. *Haro*, 745 F.3d at 1260; *Herman*, 308 F.3d at 589; *Rudy*, 777 F. Supp. 2d at 260. Thus, although not mentioning potential offsets for extra compensation, the Labor Department's "statements of general policy or interpretation" emphasize that overtime may not be averaged over a two-week period, and emphasize the need to calculate and pay overtime as soon as practicably possible:

> . . . if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40.
>
> * * *
>
> The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the

> employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

29 C.F.R. §§ 778.104 & .106. *See Haro*, 745 F.3d at 1260; *Herman*, 308 F.3d at 589–90; *Howard*, 274 F.3d at 1148; *Rudy*, 777 F. Supp. 2d at 261. Cumulative offsets, perhaps applied years later, obviously do not fit within this framework.

Third, the Labor Department has, on occasion, issued private opinion letters interpreting the FLSA to require application of offsets to overtime earned in the same "pay period[]." Letter from Herbert J. Cohen, Deputy Administrator, U.S. Dep't of Labor, WH-526, 1985 WL 304329 (Dec. 23, 1985). *See Herman*, 308 F.3d at 592; *Rudy*, 777 F. Supp. 2d at 261.

Fourth, allowing cumulative offsets might encourage employers to ignore FLSA-mandated overtime for as long as possible, *e.g.*, until sued and thus forced to actually calculate the potential overtime. *Howard*, 274 F.3d at 1148–49; *Rudy*, 777 F. Supp. 2d at 261.

Fifth, allowing cumulative offsets would be a windfall to employers, permitting them to avoid paying perhaps all FLSA-mandated overtime compensation. *Herman*, 308 F.3d at 592; *Howard*, 274 F.3d at 1148; *Rudy*, 777 F. Supp. 2d at 262.

    2.    <u>Decisions Favoring Employers</u>

This Court likewise finds the foregoing considerations persuasive, although not without reservation, as explained below.

        a.    *"Already Paid" or "Pre-Paid"*

The Fifth Circuit, which allows cumulative offsets, makes a good point when it

reasons that permitting cumulative offsets is not necessarily the same as permitting the employer "to pay its overtime obligations years after they were due." *Singer v. City of Waco*, 324 F.3d 813, 828 (5th Cir. 2003). Instead, it would be more accurate to say that the employer had "*already paid* the bulk of its overtime obligations." *Id*. (emphasis in original). In other words, an employer cannot claim offsets unless it has already paid "extra compensation," meaning that employees might have already received everything to which they would have been entitled under the FLSA alone. For various reasons, however, the Court ultimately does not find this point persuasive in favor of WECC.

The most significant difficulty with the Fifth Circuit's "already paid" reasoning is that there is essentially no accountability. Perhaps the extra compensation adds up to whatever the FLSA would have required, but not necessarily so, and there is no incentive to keep a ledger or "settle up" with employees at regular intervals. Rather, the employer could assume (without ever confirming) that its extra compensation likely covers its FLSA obligations and wait until someone complains before actually calculating what those obligations would have been.

Moreover, as the Fifth Circuit acknowledges, an employer who fails to timely pay earned overtime (usually in the next paycheck after the pay period has closed) is already violating the FLSA. *Id*. The Fifth Circuit escapes this problem by recharacterizing the extra compensation as "*pre*-payments [during non-overtime workweeks] . . . to compensate [the employees] for the shortfalls they would receive in subsequent [overtime workweeks]." *Id*. (emphasis in original). Perhaps this could be an accurate characterization for certain employers, but again, there is no incentive to

keep track—to keep a ledger and ensure that "prepaid" overtime matches actual hours worked by any particular employee.

        b.    *Windfall*

The Sixth, Seventh, and Ninth Circuits' reasoning that anything but a workweek-by-workweek calculation creates a "windfall" to the employer also gives the Court pause. A District of Massachusetts decision sees a workweek-by-workweek calculation as conferring an unjustifiable windfall on the employee: "[f]orcing an employer, who has given a premium rate of pay for overtime, to forego the receipt of credit and to *pay additional overtime* punishes the employer without regard to whether it was attempting to avoid its obligation to adequately compensate employees for extra hours worked." *O'Brien v. Town of Agawam*, 491 F. Supp. 2d 170, 176 (D. Mass. 2007) (alteration in original; internal quotation marks omitted; emphasis added). WECC similarly argues that anything other than the cumulative approach would "penalize[] [it] for its generosity in paying [Cartier] more overtime pay than was required." (ECF No. 48 at 12.)

This is an interesting consideration, but the Court ultimately finds it unpersuasive. The FLSA's permission to offset FLSA-mandated overtime with contractual extra compensation does not trump the FLSA's overarching purposes, including its purpose to ensure that employees are timely paid what they are owed. *See Herman*, 308 F.3d at 590; *Howard*, 274 F.3d at 1148; *Rudy*, 777 F. Supp. 2d at 261–62. Thus, it is not a windfall to an employee to receive (nor a penalty to the employer to pay) FLSA-mandated overtime compensation in the employee's next paycheck; that is exactly how the FLSA was intended to work. It simply does not fit within the FLSA's statutory scheme and purposes to adopt an interpretation that

permits an employer to withhold the overtime pay rate, potentially indefinitely, in expectation that contractual extra compensation will cover it in the future. Nor may the employer withhold the overtime pay rate because it believes that it "overpaid" (by FLSA standards) in previous pay periods.

The Court therefore holds that any overtime offset under 29 U.S.C. § 207(h)(2) must be calculated on a workweek-by-workweek basis.[1]

**B.      State-Law Claim**

      1.      <u>Applicability of Minimum Wage Order</u>

Cartier also asserts a state-law claim for violation of "the Colorado Wage Claim Act, § 8-4-101, *et seq*. (the 'Wage Claim Act'), and the Colorado Minimum Wage Act, C.R.S. § 8-6-101, *et seq*., as implemented by the Colorado Minimum Wage Order (the 'Minimum Wage Act')." (ECF No. 16 ¶ 1; *see also id*. ¶¶ 13–16.) Neither Cartier's complaint nor his summary judgment motion explains the precise basis for this claim. In particular, it is difficult to tell whether the claim relies on the combined effect of the Wage Claim Act, Minimum Wage Act, and Minimum Wage Order, or whether each of these authorities provides an independent basis for liability.

WECC, in its summary judgment motion, argues specifically against the applicability of the Minimum Wage Order. (ECF No. 48 at 14–17.) WECC frames its

---

[1] WECC has hinted that this case may largely turn on instances where RCSOs worked the Saturday-night-to-Sunday-morning shift, which straddles two workweeks. (ECF No. 47 at 9; ECF No. 48 at 8.) Perhaps that scenario merits some sort of limited exception to the workweek-by-workweek standard. The Court does not reach that question, however, because it is not clear that it is actually at stake here. As noted previously, WECC only asserts this scenario in argument, not as part of its statement of material facts. Attorney argument is not evidence. *Watson v. Dillon Cos., Inc.*, 2013 WL 4547477, at *7 n.2 (D. Colo. Aug. 28, 2013).

argument as if defeating the applicability of the Minimum Wage Order necessarily defeats the entire cause of action. (*See id*.) WECC does not explain precisely how the first ruling automatically leads to the second, but Cartier does not respond with an "even if" argument (*e.g.*, "even if WECC is right about the Minimum Wage Order, the state-law claim still stands"). Given that, the Court will resolve the argument on its merits.

The Minimum Wage Order "regulates wages, hours, working conditions and procedures for certain employers and employees for work performed within the boundaries of the state of Colorado in the following industries: (A) Retail and Service[;] (B) Commercial Support Service[;] (C) Food and Beverage[; and] (D) Health and Medical." 7 Colo. Code Regs. § 1103-1:1. Cartier argues that WECC falls within the Commercial Support Service category. (ECF No. 55 at 5.)

The Minimum Wage Order defines Commercial Support Service as "any business or enterprise engaged directly or indirectly in providing services to other commercial firms through the use of service employees who perform duties such as: clerical, keypunching, janitorial, laundry or dry cleaning, security, building or plant maintenance, parking attendants, equipment operations, landscaping and grounds maintenance." 7 Colo. Code Regs. § 1103-1:2(B). On its face, this definition has nothing to do with WECC's business. Cartier insists, however, that "WECC's business is providing the service of electricity 'traffic control' to commercial utility firms, a business that fall squarely within the definition of 'commercial support service.'" (ECF No. 55 at 5.) The Court disagrees. Although the Court does not take the definition's list of specific occupations to be exclusive, the Court cannot ignore the common theme. All perform relatively low-skilled sorts of work that companies often "farm out" to vendors.

11

WECC, by contrast, requires relatively high-skilled employees and is not a vendor with which other firms contract.

Accordingly, the Court holds that the Minimum Wage Order does not apply to WECC and Cartier's state-law cause of action therefore fails as a matter of law.

### 2. Statute of Limitations

The parties also dispute when the statute of limitations began to run for Cartier's state-law cause of action. (ECF No. 44 at 4–5; ECF No. 47 at 18–20.) The Court does not reach this issue for two reasons. First, it appears moot in light of the Court's previous ruling regarding the Minimum Wage Order. Second, even if the foregoing ruling did not moot the question, the parties present it essentially in the abstract. They provide no timeline or other context demonstrating that certain claims or instances of nonpayment would actually be cut off by a ruling adverse to Cartier. On this record, then, any statute of limitations ruling would be an advisory opinion. "It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies." *United States v. Burlington N. R.R. Co.*, 200 F.3d 679, 699 (10th Cir. 1999) (internal quotation marks omitted). The Court accordingly declines to rule on this aspect of the parties' motions.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiff's Motion for Partial Summary Judgment (ECF No. 44) is GRANTED IN PART and DENIED IN PART. It is granted in that the Court holds that any overtime offset under 29 U.S.C. § 207(h)(2) must be calculated on a workweek-by- workweek basis, but the motion is otherwise denied; and

2. Defendant's Motion for Partial Summary Judgment (ECF No. 48) is GRANTED IN PART and DENIED IN PART. It is granted in that the Court holds that the Minimum Wage Order does not apply to WECC and so Cartier's state-law cause of action fails as a matter of law, but the motion is otherwise denied.

Dated this 9th day of June, 2015.

BY THE COURT:

William J. Martinez
United States District Judge